UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| LEXUS RODRIGUEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>MENTOR ABI, LLC d/b/a<br>NEURORESTORATIVE MAINE,<br><br>    Defendant. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES Plaintiff, Lexus Rodriguez ("Plaintiff" or "Mr. Rodriguez"), by and through undersigned counsel, and complains against Defendant, Mentor ABI, LLC d/b/a NeuroRestorative Maine ("Defendant" or "NeuroRestorative"), as follows:

JURISDICTION AND PARTIES

1. This action arises under Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981, *et seq.*, Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.,* and the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831 *et seq.*, as enforced through the MHRA.

2. Mr. Rodriguez is a United States citizen residing in the Town of Old Orchard Beach, County of York, State of Maine.

3. Defendant is a Delaware limited liability corporation.

1

4. NeuroRestorative does business in the State of Maine, including but not limited to supported living programs in the Town of Kennebunk and the Town of Old Orchard Beach, located in the County of York.

5. Plaintiff is an "employee" as that term is defined under Title VII, the MHRA, and the WPA.

6. Defendant has several thousand employees.

7. Compensatory damages under the WPA and MHRA can reach $500,000 for employers with over 500 employees.

8. Section 1981 has no cap on compensatory damages.

9. The amount in controversy exceeds $75,000.00.

10. This Court has subject matter jurisdiction over Mr. Rodriguez's claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

11. On or about November 21, 2018, Plaintiff filed a timely Complaint/Charge of Discrimination against Defendant with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC") alleging that Defendant subjected him to unlawful discrimination on the bases of race and color, retaliation, and whistleblower retaliation.

12. On November 21, 2019, the MHRC issued a Notice of Right to Sue with respect to Plaintiff's claims under the WPA and the MHRA.

13. On November 27, 2019 the EEOC issued a Notice of Right to Sue with respect to Plaintiff's claims under Title VII.

14. Plaintiff has exhausted his administrative remedies with respect to all claims set forth in this Complaint that require administrative exhaustion.

JURY TRIAL REQUESTED

15. Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

FACTUAL ALLEGATIONS

16. Mr. Rodriguez is Puerto Rican and bi-racial, Black and Hispanic.

17. In December 2017, Mr. Rodriguez was hired to work for NeuroRestorative as a Life Skills Trainer and Certified Residential Medication Aide.

18. Mr. Rodriguez's standard schedule was Sunday through Thursday nights. He usually worked at House 1 and House 2 in Old Orchard Beach.

19. Mr. Rodriguez often worked overtime. He once worked close to 190 hours in a two-week period.

20. The reason Mr. Rodriguez worked so many hours is that NeuroRestorative had a hard time retaining employees.

21. Some of the clients who lived in supported living homes operated by NeuroRestorative had aggressive behaviors and needed constant one-on-one supervision.

22. Understaffing was a problem and it created unsafe conditions for clients and staff.

23. Understaffing was also illegal.

24. Supported living homes operated by NeuroRestorative where Mr. Rodriguez worked are Level VI Residential Care Facilities that are required to follow State of Maine, Department of Health and Human Services Regulations Governing the Licensing and Functioning of Assisted Housing Programs. Part 10-144, Chapter 113, Effective Date (Last Amended): August 20, 2008. Staffing levels are set forth at 13.1 and 13.2, as follows:

> 13.1   General requirements.  Minimum staffing shall be adequate to implement service plans, as well as to provide a safe setting.  The Department reserves the right to require additional personnel or to modify the requirements of this section

3

due to the level of supervision and care required by the residents, the size of the facility, and distinct parts or distribution of residents throughout the physical plant. It is further required that all regular staff have in-service training at least annually, in areas related to the specific needs of the residents served.

25. Mr. Rodriguez and other staff did not receive proper training to understand and manage clients' aggressive behaviors, which created unsafe conditions for clients and staff.

26. Mr. Rodriguez never received orientation for his position.

27. Mr. Rodriguez does not believe that he was trained through the QBISP program or CPI training.

28. Mr. Rodriguez did not receive any formal training for any aspect of his work. The only training he received was at team meetings that were held in front of clients.

29. NeuroRestorative had clients who were racist and were verbally and physically aggressive and threatening toward people of color because of their race and/or ethnicity.

30. Mr. Rodriguez was never trained how to handle being verbally and physically harassed because of his race and ethnicity.

31. NeuroRestorative had clients who were sexually aggressive or inappropriate in other ways.

32. NeuroRestorative staff, including Mr. Rodriguez, were not properly trained to provide services those clients needed.

33. For example, Client-S, who lived in House 1, had autism as well as a traumatic brain injury. Mr. Rodriguez and other staff could not manage Client-S's behaviors. It took hours to accomplish small tasks. One day, Client-S had been taken to the hospital for something. Co-worker Christina (LNU) was with Client-S at the hospital. The Residential Supervisor, Samantha Casey, sent Mr. Rodriguez to the hospital to relieve Christina (LNU). Ms. Casey wanted Mr. Rodriguez to tell the doctors that NeuroRestorative was not going to take Client-S back to live at

4

House 1. Ms. Casey told Mr. Rodriguez and Christina (LNU) to just leave Client-S there at the hospital. Mr. Rodriguez was shocked that they were abandoning Client-S, which he believed to be illegal. Mr. Rodriguez said, "Are you sure we can just leave?" Ms. Casey told him, "Yes, just leave."

34. During the spring and early summer of 2018, Client-K (who lived in House 1) was very aggressive, got in Mr. Rodriguez's face, used the "N" word, put his cane in Mr. Rodriguez's face, and hit Mr. Rodriguez with his cane. Mr. Rodriguez documented this in Incident Reports that were given to NeuroRestorative. No one told Mr. Rodriguez how to deal with racist clients. Client K was later moved to Sebago House and Mr. Rodriguez did not need to work with him any longer.

35. Client-P lived in House 3, which is also located in Old Orchard Beach. Client-P was physically and sexually aggressive and inappropriate and did not always take his medications. One day, Client-P was taken to the hospital for a psychiatric evaluation. Ms. Casey called and told Mr. Rodriguez to go to the hospital and bring Client-P back home. Mr. Rodriguez told Ms. Casey that he did not feel comfortable doing this given Client-P's aggressive behaviors.

36. Ms. Casey had the police escort Client-P back to House 3.

37. Mr. Rodriguez was working at House 3 with co-workers Heather Beach and Jean Pierre (LNU) when the police dropped Client-P off. After the police left, Client-P's conduct was out of control and staff were unable to manage or redirect him. The police had to return several times to speak with Client-P. Client-P would agree to calm down but that did not last long after the police left.

38. Among other things, Client-P grabbed his shoe and smacked the back of Ms. Beach's chair; sexually harassed another client by putting his genitals in her face; physically

5

threatened Mr. Rodriguez by making a fist and telling him, "You need to do your job"; refused to let others watch TV by ripping out the cable box and taking it to his room; moved Jean Pierre (LNU)'s personal belongings; stole Ms. Beach's cigarettes; went into clients' rooms and harassed them; and so on.

39. Staff called Ms. Casey for guidance on how to handle Client-P. The only suggestion she had was to call the police. Finally, Ms. Casey told staff to send Client-P to a hotel in Biddeford. Upon information and belief, Ms. Casey thought the police in Biddeford would be more assertive than the police in Old Orchard Beach and would arrest Client-P.

40. Mr. Rodriguez paid with his own money for a cab to take Client-P to a hotel. Ms. Beach went to the hotel in her own car, met Client-P there, and paid for his room using agency money. Within 20 minutes of dropping Client-P off, the hotel front desk called and reported that Client-P was being disruptive, disturbing other guests and damaging property. The police arrested Client-P and he spent the night in jail. Ms. Casey picked up Client-P in the morning and took him back to House 3. A few weeks later, Client-P was moved to Kennebunk ("KB") House.

41. Client-R lived in KB House.

42. Client-R was a known racist.

43. Staff, supervisors, and management were all aware that Client-R dropped the "N" word all the time. He called black people "monkey."

44. Client-R chased a black Somali employee and threatened him with a knife.

45. On Monday, September 24, 2018, Mr. Rodriguez was working a 12-hour, overnight shift at House 1. Ms. Beach was working with him that night at House 1.

46. Ryan [LNU] and Jaylynn Romero were working an overnight shift at House 2.

47. Ms. Casey called the Program Manager, Kimberly Costa, and asked her to send Ryan [LNU] (who is white) over to KB House to cover the overnight shift for a no-call, no-show.

48. Ms. Costa initially agreed, but called Ms. Casey back and said she preferred to send Mr. Rodriguez.

49. Ms. Casey called Mr. Rodriguez and told him to go work at KB House that night.

50. Mr. Rodriguez told Ms. Casey no, that he was not going to deal with Client-R's racism and that he did not feel safe working around Client-P because he had been physically aggressive toward Mr. Rodriguez.

51. At first, Mr. Rodriguez tried to make an excuse about not having enough gas in his car but Ms. Casey told Mr. Rodriguez that he could use an agency van.

52. Mr. Rodriguez eventually told Ms. Casey the real problem was that he was not going to put up with Client-R's "racist shit" all night. Mr. Rodriguez told Ms. Casey that even if they paid him hundreds of dollars, he would not work at KB House.

53. Ms. Casey told Mr. Rodriguez, alright, just so you know, you are choosing termination.

54. Mr. Rodriguez's refusal to work in a racially hostile environment was not a burden on anyone.

55. Co-worker, Ryan [LNU], lived closer to Wells, much closer to Kennebunk than Mr. Rodriguez, and had agreed to cover for the no-call, no show at KB House.

56. There was no need for Defendant to force Mr. Rodriguez to work in a racially hostile work environment.

57. On Thursday, September 27, 2018, Mr. Rodriguez was called into a meeting with Ms. Costa and Dawn Pahel, HR Generalist, after his overnight shift ended.

58. Mr. Rodriguez had agreed to come in early, at 3 PM the day before, for what turned out to be his final shift.

59. Mr. Rodriguez's refusal to work the overnight at KB House on September 24, 2018 was discussed at the meeting.

60. Ms. Pahel and Ms. Costa accused Mr. Rodriguez of cursing at Ms. Casey. Mr. Rodriguez admitted that he used curse words (like bullshit and shit) but explained that he did not direct the words at Ms. Casey and that he cursed because she threatened his job.

61. Mr. Rodriguez told Ms. Costa and Ms. Pahel that he refused to work at KB House because of Client-R's racist, violent conduct toward minorities.

62. Mr. Rodriguez also told Ms. Costa and Ms. Pahel that he felt unsafe working at KB House because of Client-P's previous aggressive conduct toward him.

63. Upon information and belief, Client-P required one-on-one supervision for his own safety and the safety of others. On the night that Mr. Rodriguez was told to go work at KB House, the house was going to be staffed by only two staff and eight clients, which was unsafe and illegal.

64. Mr. Rodriguez asked Ms. Costa and Ms. Pahel, "Don't I have the right to refuse if I feel unsafe?"

65. Ms. Pahel said, referring to Client-P, "He didn't hit you, did he?"

66. Mr. Rodriguez could tell that Ms. Pahel did not understand how dangerous Client-P was so he stood up to demonstrate exactly how close and physically aggressive Client-P had been toward him.

67. Mr. Rodriguez was not aggressive toward his supervisors; he was demonstrating why he felt unsafe around Client-P, who was physically aggressive toward him.

68. Ms. Pahel yelled at Mr. Rodriguez, telling him to "sit down!"

69. Ms. Pahel told Mr. Rodriguez, "Feeling unsafe is no reason to refuse," "It's insubordination," and "We are terminating you."

70. Mr. Rodriguez disputes NeuroRestorative's claim that he had "significant issues with his attitude, language and behavior" toward supervisors "throughout his employment."

71. Mr. Rodriguez did not yell and use the words "fucking bullshit" on December 8, 2017 while completing new-hire paperwork. Mr. Rodriguez was never informed about this allegation during his employment. It was not cited as a reason for his termination in a letter written by counsel for Defendant on October 24, 2018.

72. Mr. Rodriguez was not insubordinate or unprofessional toward Ms. Casey on September 24, 2018 when Ms. Casey told Mr. Rodriguez that he had to leave his assignment at House 1 to go work at KB House to cover for a person who was "no-call, no-show" for their shift.

73. Mr. Rodriguez objected to being reassigned to work at KB House because Client-R was a racist and created a racially hostile working environment for staff who, like Mr. Rodriguez, are racial minorities.

74. Mr. Rodriguez also objected to the switch because Client-P had been physically aggressive toward him in the past.

75. Mr. Rodriguez admits that he used curse words while speaking with Ms. Casey but only after Ms. Casey threatened Mr. Rodriguez's job when he objected to working in a racially hostile work environment under unsafe and illegal conditions.

76. NeuroRestorative did not conduct a good faith investigation into Ms. Casey's allegations that Mr. Rodriguez was insubordinate and unprofessional.

77. Mr. Rodriguez's personnel file does not contain any documents reflecting that an investigation was made. Defendant's answer to the MHRC did not contain any such documents either.

78. It appears that NeuroRestorative took Ms. Casey's word over Mr. Rodriguez's.

79. Ms. Pahel did not ask Mr. Rodriguez for his side of the story when she and Ms. Costa met with Mr. Rodriguez on September 27, 2018. The decision to fire Mr. Rodriguez was made before Ms. Pahel and Ms. Costa met with Mr. Rodriguez.

80. NeuroRestorative claims that Mr. Rodriguez objected to being reassigned from House 1 to KB House because he "was motivated by a desire to do as little work as possible while keeping his job." There is no factual support for that claim.

81. Mr. Rodriguez cared deeply for his clients. He routinely went to work early and picked up extra shifts. Mr. Rodriguez often worked overtime, up to 190 hours in a two-week period. Mr. Rodriguez's motivation was solely to protect himself from racial and physical abuse.

82. Mr. Rodriguez had a good faith belief that working with Client-R would result in racial harassment which would cause him to suffer serious mental injury. Racial-based trauma and stress is known to cause depression, intrusion (the inability to get the thoughts about what happened out of one's mind), vigilance (an inability to sleep, out of fear of danger), anger, loss of appetite, apathy and avoidance symptoms and emotional numbing.

83. Defendant characterized Mr. Rodriguez as "mouthy" because Mr. Rodriguez spoke up about unsafe and illegal conditions at work as described, for example, in paragraphs 33,

34, and 35.   Mr. Rodriguez's supervisors resented it when Mr. Rodriguez engaged in protected activity under the WPA.

84. White employees refused assignments to work in certain houses and were not fired.

85. White employees missed team meetings all the time and were not terminated.

86. Defendant violated Mr. Rodriguez's rights under Section 1981, Title VII and the MHRA by disciplining and firing him because of his race.

87. Defendant violated Mr. Rodriguez's rights under Section 1981, Title VII and the MHRA by firing him for reporting that KB Home, where he was told to work, was a racially hostile work environment.

88. Defendant violated Mr. Rodriguez's rights under the WPA, as enforced through the MHRA, by firing him for refusing an illegal and unsafe directive, i.e., Ms. Casey's demand that he work in a racially hostile work environment.

89. Defendant violated Mr. Rodriguez's rights under the WPA by firing him for reporting that KB House was unsafe and in violation of DHHS staffing regulations and that he faced potentially life-threatening conditions if he was forced to work there.

90. Defendant's policies had the effect of discriminating against Mr. Rodriguez because of his race and color.

91. Race and color were a motivating factor in Mr. Rodriguez's termination.

### COUNT I: Section 1981 - Discrimination

92. Paragraphs 1-91 are incorporated by reference.

93. Defendant denied Plaintiff the same employment rights and benefits as enjoyed by white citizens.

### COUNT II: Section 1981 - Retaliation

94. Paragraphs 1-93 are incorporated by reference.

95. Defendant retaliated against Plaintiff for asserting his rights under Section 1981.

### COUNT III: Title VI - Discrimination

96. Paragraphs 1-95 are incorporated by reference.

97. Defendant discriminated against Plaintiff in the terms, conditions and privileges of employment and terminated him because of his race and color.

98. Defendant's policies had the effect of discriminating against Plaintiff because of his race and color.

### COUNT IV: Title VII - Retaliation

99. Paragraphs 1-98 are incorporated by reference.

100. Defendant retaliated against Plaintiff for asserting his rights under Title VII.

### COUNT V: MHRA - Discrimination

101. Paragraphs 1-100 are incorporated by reference.

102. Defendant discriminated against Plaintiff in the terms, conditions and privileges of employment and terminated him because of his race and color.

103. Defendant's policies had the effect of discriminating against Plaintiff because of his race and color.

### COUNT VI: MHRA - Retaliation

104. Paragraphs 1-103 are incorporated by reference.

105. Defendant retaliated against Plaintiff for asserting his rights under the MHRA.

### COUNT VII: WPA

106. Paragraphs 1-105 are incorporated by reference.

107. Defendant's conduct violates the WPA as enforced through the MHRA.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

(a) Declare the conduct engaged in by Defendant to be in violation of his rights;

(b) Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate Plaintiff's rights;

(c) Order Defendant to employ Plaintiff in his former position;

(d) Award equitable-relief for back pay, benefits and prejudgment interest;

(e) Award compensatory damages in an amount to be determined at trial;

(f) Award punitive damages in an amount to be determined at trial;

(g) Award civil penal damages in an amount to be determined at trial;

(h) Award liquidated damages in an amount to be determined at trial;

(i) Award nominal damages;

(j) Award attorney's fees, including legal expenses, and costs;

(k) Award prejudgment interest;

(l) Permanently enjoin Defendant from engaging in any employment practices that discriminate on the basis of race and color;

(m) Permanently enjoin Defendant from engaging in any employment practices that retaliate against employees who assert their right to be free from race and color discrimination or who report unsafe and/or illegal conditions;

(n) Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate retaliation in the future;

(o) Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

    (p)    Require that Defendant train all management level employees on the protections afforded by Section 1981, Title VII, the MHRA, and the WPA;

    (q)    Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of race discrimination and retaliation; and

    (r)    Grant to Plaintiff such other and further relief as may be just and proper.

Dated:  January 6, 2020                                 /s/ Chad T. Hansen
                                                               Chad T. Hansen
                                                               Attorney for the Plaintiff

                                                               MAINE EMPLOYEE RIGHTS GROUP
                                                               92 Exchange Street 2nd floor
                                                               Portland, Maine 04101
                                                               Tel. (207) 874-0905
                                                               Fax (207) 874-0343
                                                               Chad@EmployeeRightsLaw.Attorney